## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| LIBERTY INITIATIVE FUND; U.S. TERM LIMITS; ARKANSAS TERM LIMITS; TIMOTHY DANIEL JACOB; TRENTON DONN POOL; ACCELEVATE 2020, LLC, and LAWRENCE COOK, | : <br> : <br> : <br> : <br> : **Civil Action** <br> : **Judge Moody** |
| **Plaintiffs,** | : <br> : **No. 21-cv-460** |
| **v.** | : <br> : **BRIEF IN PARTIAL** |
| **JOHN THURSTON**, in his official capacity as the Secretary of State for the State of Arkansas, | : **OPPOSITION TO** <br> : **DEFENDANT'S MOTION** <br> : **TO DISMISS** |
| **Defendant.** | : *Filed Electronically* |

Plaintiffs, by and through their undersigned legal counsel, submit this brief in partial opposition to Defendant's motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure.

## I.   STANDARD OF REVIEW

It is well settled that to survive a motion to dismiss, the complaint need only contain sufficient factual matter that, accepted as true, "state[s] a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Facial plausibility is established once the factual content of a complaint 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Iqbal*, 556 U.S. at 678.  A plaintiff is not required to plead "detailed factual

allegations" in order to survive a motion to dismiss.  *Id*.  Rather, it is enough to

survive a motion to dismiss if the facts alleged in the complaint, which must be

taken as true, move the claim "across the line from conceivable to plausible."

*Twombly*, 550 U.S. at 570.  Accordingly, issues of fact are resolved for the trier of

fact and claims which depend on the further factual development cannot be

dismissed on a 12(b)(6) motion to dismiss.  As such, First Amendment claims,

especially those which implicate ballot access restriction, cannot be dismissed at

this stage of the litigation where the United States Supreme Court has clearly

established an analysis based on the facts of the case

## II.   <u>ARGUMENT</u>

A.   Defendant's Motion to Dismiss Should Be Denied Because Plaintiffs State
     Valid Claims Under the First and Fourteenth Amendments to the United
     States Constitution.

1.   <u>Summary</u>

The Supreme Court has established that ballot access restrictions which

reduce the pool of available petition circulators are subject to strict scrutiny

analysis which can only be saved if they are narrowly tailored to advance a

compelling governmental interest.  Federal courts are virtually unanimous that

blanket residency bans are not narrowly tailored to advance a state's legitimate

interest to police potential petition fraud because a state can more narrowly require

out-of-state petition circulators to first submit to the jurisdiction of the state for any

post filing investigation, prosecution and service of process.  Likewise, compensation bans are subject to strict scrutiny analysis where they are shown to reduce the pool of available petition circulators and courts have flatly rejected the state's alleged interest in the challenged compensation ban as a method tailored to protect against fraud.

Arkansas' disclosure requirement of paid petition circulators is unconstitutional and directly controlled by the United States Supreme Court's decision in *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182 (1999).

> 2.   Supreme Court Analysis Support Valid First Amendment Claims Against Residency Requirements for Petition Circulators, <u>Compensation Bans for Circulators and Reporting Requirements</u>.

In 1988, the United States Supreme Court held in *Meyer v. Grant*, 486 U.S. 414 (1988), that a ban on paying petition circulators was unconstitutional reasoning that the circulation of a ballot access petition like a referendum petition involves interactive communication between the circulator and the potential signer which the Court described as "core political speech" meriting the highest protections under the First Amendments such that any restriction which decreased the pool of available circulators was subject to struct scrutiny analysis.   The Court in *Meyer* explained:

> We fully agree with the Court of Appeals' conclusion that this case involves a limitation on political expression subject to exacting

3

scrutiny.  The First Amendment provides that Congress "shall make no law…abridging the freedom of speech, or of the press; or the right of people to peaceably assemble, and to petition the Government for a redress of grievances."   The Fourteenth Amendment makes that prohibition applicable to the State….

The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.  Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate.  This will in almost every case involve an explanation of the nature of the proposal any why its advocates support it.  Thus, the circulation of a petition involves the type of interactive communication concerning political change this is appropriately described as "core political speech."

The refusal to permit appellees to pay petition circulators restricts political expression in two ways.  First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach.  Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion….

That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protections….That [the statute] leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression.  The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.

*Meyer*, 486 U.S. at 420-24 (internal citations omitted).

Following its analysis in *Meyer*, the Supreme Court in *Buckley* upheld the

Tenth Circuit Court of Appeals' decision holding the requirement in Colorado that

petition circulators be registered voters unconstitutional as the requirement reduced the number of persons available to carry the message advanced by the petition sponsors and reduced the number of hours that could be worked and limited the number of persons the circulators could reach without impelling cause. *Buckley*, 525 U.S. 193-197.  In *Buckley*, the Court approved the Tenth Circuit's analysis that:

> The Tenth Circuit reasoned that the registration requirement placed on Colorado's voter-eligible population produces a speech diminution of the very kind produced by the ban on paid circulators at issue in *Meyer*. We agree.  The requirement that circulators be not merely voter eligible, but registered voters, it is scarcely debatable given the uncontested numbers decrease the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators.  Both provisions 'limi[t] the number of voices who will convey[the initiative proponents'] message' and, consequently, cut down "the size of the audience [proponents] can reach.'  *Meyer*, 486 U.S. at 422, 423; *see Bernbeck v. Moore*, 126 F.3d 1114, 1116 (8th Cir. 1997) (quoting *Meyer*); *see also Meyer*, 486 U.S. at 423 (stating, further, that the challenged restriction reduced the chances that initiative proponents would gather signatures sufficient in number to qualify for the ballot, and thus limited proponents' 'ability to make the matter the focus of statewide discussion').
>
> Colorado acknowledges that the registration requirement limits speech, but not severely, the State asserts, because 'it is exceptionally easy to register to vote.'  The ease with which qualified voters may register to vote, however, does not lift the burden on speech at petition circulation time.  Of course there are individuals who fail to register out of ignorance or apathy.  But there are also individuals for whom, as the trial record shows, the choice not to register implicates political thought and expression….
>
> The State's dominant justification appears to be its strong interest in policing lawbreakers among circulators.  Colorado seeks to ensure that

circulators will be amenable to the Secretary of State's subpoena power, which in these matters does not extend beyond the State's borders. The interest in reaching law violators, however, is served by the requirement, upheld below, that each circulator submit an affidavit setting out, among several particulars, the 'address at which he or she resides, including the street name and number, the city or town, [and] the county.' The address attestation, we note, has an immediacy, and corresponding reliability, that a voter's registration may lack. The attestation is made at the time a petition section is submitted; a voter's registration may lack that currency.

*Buckley.* 525 U.S. at 194-96.

*Buckley* also established that Colorado's disclosure requirement that initiative and referendum sponsors who pay circulators to "file both a final report when the initiative petition is submitted to the Secretary of State, and monthly reports during the circulation period" was unconstitutional insofar as it compelled disclosure of information specific to each paid circulator, including their names and addresses. *Buckley*, 525 U.S. at 201-04. The Court in *Buckley* explained that "exacting scrutiny is necessary when compelled disclosure of campaign-related payments is at issue" and that "ballot initiatives do not involve the risk of '*quid pro quo*' corruption present when money is paid to, or for, candidates." *Buckley*, 525 U.S. at 203 (quoting *Meyer*, 486 U.S. at 427-28, citing *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) (explaining the risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue)). *Buckley* therefore held that the requirement to disclose and list "paid circulators and their income 'forces paid circulators to surrender the

anonymity enjoyed by their volunteer counterparts" and to the extent disclosure requirements target paid circulators they fail exacting scrutiny as the disclosure requirements are no more than "tenuously related to the substantial interests" disclosure serves in other contexts. *Buckley*, 525 U.S. 204.

3.   Plaintiffs State a Valid First Amendment Claim Challenging the Constitutionality of the Residency Requirement for Initiative and Referendum Petition Circulators Imposed Under AR Code § 7-9-103(a)(6).

Using the same analysis employed by the United States Supreme Court in *Meyer* and *Buckley*, state residency requirements for petition circulators have been held unconstitutional by every Court of Appeals to consider the issue where out-of-state petition circulators can be required to submit to the jurisdiction of the subject state for purposes of the state's subpoena power for any post-filing investigation and/or prosecutions.

Only the Eighth Circuit in *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (2001), upheld a residency requirement following the Supreme Court's decisions in *Meyer* and *Buckley*.  In *Jaeger*, the Eighth Circuit specifically stated that there was "no evidence in the record" of the alleged burden associated with North Dakota's ban on out-of-state residents.  It is the lack of a record in *Jaeger* that distinguishes *Jaeger* from every other decision issued by the federal district and circuit courts.  Further, unlike every federal challenge to residency requirements for petition circulators which followed *Jaeger,* the Court in *Jaeger*

7

was never presented, nor considered, that a blanket ban was not narrowly tailored to advance the state's interest to police against petition fraud. After *Jaeger* was decided, every subsequent challenge to blanket out-of-state circulator bans was held unconstitutional under strict scrutiny analysis because it was determined that requiring out-of-state petition circulators to submit to the jurisdiction of the state was a narrower means of protecting that state's interest to police against petition fraud. The lack of a record in *Jaeger*, especially in the issue of requiring out-of-state petition circulators to submit to the jurisdiction of the state to protect the state's interest to police against the rare instance of petition fraud, is the primary reason cited by other federal district and appellate courts for rejecting the Eight Circuit's opinion, including district courts in the Eighth Circuit. *See e.g.*, *Nader v. Brewer*, 531 F.3d at 1036-37.

In fact, the only district court in the Eighth Circuit to consider residency requirements for petition circulators after the Eighth Circuit's decision in *Jaeger*, declined to follow *Jaeger*, holding Nebraska's ban on out-of-state circulators unconstitutional as not being narrowly tailored to protect the state's interest to police petition fraud under strict scrutiny analysis. The district court in Nebraska expressly declined to follow the Eighth Circuit's decision in *Jaeger* in *Citizen's in Charge v. Gale*, 810 F.Supp.2d 916 (2011) determining it did not control in a case where the record established that a challenged residency restriction imposed a

severe burden on speech through a reduction of the pool of available circulators

triggering strict scrutiny analysis and where a more narrow means exists to protect

the state's interests by requiring out-of-state circulators to submit to the state's

jurisdiction for any post-filing investigation. *Citizens in Charge v. Gale*, 810

F.Supp. 2d 916, 925-27 (D. Neb. 2011). The district court in *Citizens in Charge*,

explained:

> However, defendant argues that *Jaeger* is dispositive of this case.
> Defendant contends the Eighth Circuit Court of Appeals in *Jaeger*
> found that the North Dakota residency requirement, which had a law
> similar to the one in this case, was valid. The Eighth Circuit noted that
> *Buckley* struck down the voter registration requirement but was not
> asked whether the residency requirements for petition circulators were
> permissible. *Jaeger*, 241 F.3d at 616. The Eighth Circuit based its
> finding in part by determining that North Dakota had a compelling
> interest in preventing fraud. *Jaeger*, 241 F.3d at 616. The court in
> *Jaeger* did not specifically determine if the residency requirement was
> narrowly tailored, but it did cite to two district court decisions that so
> found. *See Jaeger*, 241 F.3d at 617 (citing *Kean v. Clark*, 56 F.Supp.2d
> 719 (S.D. Miss. 1999) and (*Initiative & Referendum Institute v.
> Secretary of State of Maine*, 1999 WL 33117172 (D. Me., April 23,
> 1999))….Defendant relies on *Jaeger* and asks the court find it
> dispositive on the claims in this case. The court disagrees and finds that
> *Jaeger* does not control on this issue. During the preliminary injunction
> hearing, the court determined that *Jaeger* would most likely apply.
> However, the court had received insufficient evidence at that time and
> *Jaeger* appeared to control. Following the submission of evidence and
> argument, the court believes that *Jaeger* is distinguishable. The Eighth
> Circuit in *Jaeger* specifically stated that there was "no evidence in the
> record" of the alleged burden associated with the ban. *Id*. at 618.
>
> The court believes that the plaintiffs and intervenors have met their
> burden in this regard. The plaintiffs and intervenors have offered
> evidence of increased costs; evidence of the ability of trained solicitors
> to come in and do the job in the time permitted, and how training new

solicitors is an increased cost burden; offered evidence as to a reduction of the available pool of circulators if only in-state petitioners are used; offered evidence as to the lack of any petition circulation firms in the State of Nebraska, other than those who petition for KENO issues; the Libertarian Party showed that there are very few instances of fraud in Nebraska, and only one in the last 15 years by someone from out of state, and offered evidence that the Libertarian Party has limited resources for these campaigns, which could cause the Libertarian Party to not participate in petition drives in Nebraska.  For these reasons, the court finds *Jaeger* is distinguishable.  The plaintiffs and intervenors provided sufficient evidence of a real burden on their First Amendment rights.

*Citizens in Charge*, 810 F.Supp.2d at 925-26.  It is further instructive that after the district court struck Nebraska's residency requirement as unconstitutional, the state of Nebraska failed to appeal to the Eighth Circuit – apparently Nebraska's faith in the controlling force of *Jaeger* was insufficient to file an appeal to the very court that issued *Jaeger*.  Additionally, one of the cases that *Jaeger* relied on, *Initiative & Referendum Institute v. Secretary of State of Maine*, 1999 WL 33117172 (D. Me. April 23, 1999) has been essentially overturned by the United States District Court of Maine, in its recent opinion preliminarily enjoining Maine's residency requirement for initiative and referendum petition circulators in *We the People PAC v. Bellows*. 2021 WL 569039 (D. Me., Feb. 16, 2021), attached hereto as Exhibit A.  Accordingly, any reliance by Defendants in the controlling effect of *Jaeger* is wholly inappropriate.  As applied to the instant motion, *Jaeger* clearly does not control disposition of Defendant's motion to dismiss Count I of the

complaint, because Plaintiffs, at a minimum, have the right to establish a record for an adjudication on the merits.  Further, on the pleadings, Plaintiff Pool has already established that he is prepared to submit to the jurisdiction of the state of Arkansas as a condition precedent to being able to freely circulate initiative and referendum petition in Arkansas – a key fact not made part of the record in *Jaeger*.  *See* Amend. Compl. at ⁋17.

The Arkansas residency requirement challenged by Plaintiffs, by sheer force of the number of excluded individuals who reside outside Arkansas, drastically limit the pool of circulators available to carry Plaintiffs' message for political change to the voters of Arkansas.  This reduction in the number of available petition circulators, just as the voter registration requirement reviewed by the Supreme Court in *Buckley* – and even more so, imposes a severe burden on core political speech through a reduction of the pool of available petition circulators in Arkansas triggering strict scrutiny analysis.

Further, federal courts have developed a consensus that the rational employed by the United States Supreme Court in *Buckley* is properly extended to the adjudication of state residency requirements for petition circulators of ballot access petitions and that a state can more narrowly protect its interest in policing against petition fraud by requiring out-of-state circulators submit to the state's jurisdiction for the purpose of any post-filing investigation, prosecution and/or

11

service of process related to any ballot access petition filed by the out-of-state
circulator.

Beyond the sheer numbers, the reality is that professional circulators engage
in the circulation of petitions on a nationwide basis.  Very often, the best petition
circulators are not residents of the state of Arkansas, and certainly, no one state can
claim to be the resident state of a majority of the best petition circulators in the
United States.  Accordingly, any state ban on out-of-state petition circulators
severely impairs the First Amendment right of petition proponents to field the best
army of professional petition circulators possible.

The United States Court of Appeals for the Fourth Circuit, perhaps
articulated the current state of the law on the unconstitutionality of out-of-state
circulator bans best:

> As the law has developed following the Supreme Court's decisions in
> *Meyer* and *Buckley*, a consensus has emerged that petitioning
> restrictions like the one at issue here are subject to strict scrutiny
> analysis.  *See*, *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th
> Cir. 2008) (applying strict scrutiny to overturn Oklahoma prohibition
> on nonresident circulators of initiative petitions); *Nader v. Blackwell*,
> 545 F.3d 459 (6th Cir. 2008) (declaring unconstitutional, as failing strict
> scrutiny, Ohio ban on nonresidents circulating nominating petitions);
> *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (invalidating, pursuant
> to strict scrutiny analysis, Arizona deadline and residency provisions
> relating to nominating petitions and circulator-witnesses).  The Ninth
> Circuit in *Brewer* recited the general rule that "the severity of the
> burden the election law imposes on the plaintiff's rights dictates the
> level of scrutiny applied by the court."  *Brewer*, 531 F.3d at 1034 (citing
> *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)…. The triumvirate of
> 2008 decisions in *Savage*, *Blackwell*, and *Brewer* demonstrate a general

agreement among our sister circuits that residency restrictions bearing on petition circulators and witnesses burden First Amendment rights in a sufficiently severe fashion to merit the closest examination….
[….]
The more substantial question, and the crux of this appeal, is whether the Commonwealth's enactment banning all nonresidents from witnessing nominating petitions – a measure we presume to be effective in combatting fraud – is, notwithstanding its efficacy, insufficiently tailored to constitutionally justify the burden it inflicts on the free exercise of First Amendment rights.  *See*, *Krislov v. Rednour*, 226 F.3d 851, 863 (7th Cir. 2000) ("[W]e must take into account…other, less restrictive means [the state] could reasonably employ[, though it] need not use the least restrictive means available, as long as its present method does not burden more speech than is necessary to serve compelling interests." (citations omitted).  The Board insists that the integrity of the petitioning process depends on 'state election official's access to the one person who can attest to the authenticity of potentially thousands of signatures," access made more difficult, perhaps, if the witness resides beyond the subpoena power of the state.

The plaintiffs counter that the Commonwealth could compel nonresidents, as a condition of witnessing signatures on nominating petitions, to enter into a binding legal agreement with the Commonwealth to comply with any civil or criminal subpoena that may issue.  Indeed, "[f]ederal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result."  *Brewer*, 531 F.3d at 1037 (citing inter alia, *Chandler v. City of Arvada*, 292 F.3d 1236, 1242-44 (10th Cir. 2002); *Krislov*, 226 F.3d at 866 n.7.  More recently, in *Savage*, the Tenth Circuit reiterated that "requiring non-residents to sign agreements providing their contact information and swearing to return in the event of a protest is a more narrowly tailored option."  550 F.3d at 1030.

According to the Board, ostensible consent to the extraterritorial reach of the Commonwealth's subpoena power does not guarantee the requisite access, because nonresident witnesses must yet be located and retrieved, perhaps by extradition or rendition.  There are few guarantees

> in life, however, and it is hardly an iron-clad proposition that a similarly situated resident witness will be amenable to service and comply with a lawfully issued subpoena.

*Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 316-18(4th Cir. 2013).

Following the Fourth Circuit's opinion in *Libertarian Party of Virginia* detailing the broad consensus that has developed among federal courts holding that strict scrutiny applies to bans on out of state circulators and that the blanket ban is not narrowly tailored to advance a state's legitimate interests when states can more narrowly simply require out-of-state petition circulators to submit to the jurisdiction of the state, other courts have followed the federal consensus.  In *Green Party of Pennsylvania v. Aichele*, 89 F.Supp. 3d. 723 (E.D. Pa 2015) Judge Dalzell preliminarily enjoined enforcement of the ban on out-of-state circulators for third party candidate nominating petition based on the Fourth Circuit's analysis that out-of-state circulator bans impose a severe burden to First Amendment speech triggering strict scrutiny analysis and holding that a blanket out of state ban on out-of-state circulators was not narrowly tailored to advance the state's important interests when the state court could more narrowly require out-of-state circulators to accept the state's jurisdiction for any post-filing process.  *Green Party of Pennsylvania*, 89 F.Supp. 3d. at 739-40.  Thereafter, Judge Dalzell ordered the out-of-state ban unconstitutional and permanently enjoining the Pennsylvania circulator ban.  Judge Dalzell found the out-of-state circulator ban

"sharply limits the reach of the Green Party plaintiffs' message" and "the Green Party plaintiffs have, like their Virginia colleagues, offered to subject out-of-state circulators to the jurisdiction of Pennsylvania courts 'for the express purpose of any investigative and/or judicial procedure with respect to any alleged violation(s) of Pennsylvania election law.'" *Id*. at 742.

In *Libertarian Party of Connecticut v. Merrill*, 2016 WL 10405920 (D. Conn., Jan. 26, 2016) Judge Hall held Connecticut's out-of-state circulator ban for third party candidate nominating petitions unconstitutional, finding the out-of-state circulator ban to severely impair the First Amendment rights of petition circulators, that strict scrutiny applied, and that the ban was not narrowly tailored to protect the state's important interests. *Libertarian Party of Connecticut* at *5-8. Shortly thereafter, Judge Hall issued a temporary restraining order against Connecticut's out-of-state circulator ban for circulators of major party nominating petitions. *Wilmoth v. Merrill*, 2016 WL 829866 (D. Conn. Mar. 1, 2016). Following the district court's temporary restraining order, the State of Connecticut settled the action agreeing to permanently refrain from enforcing Connecticut's out-of-state circulator ban for circulators of major party candidate nominating petitions.[1] Also in 2016, in *OpenPittsburgh,Org v. Wolosik*, 2016 WL 7985286 (W.D. Pa. Aug. 9,

---

[1] Plaintiffs' counsel in this action was counsel for the Plaintiff in *Wilmoth v. Merrill* and has firsthand knowledge of the settlement terms in that action.

2016) the United States District Court for the Western District of Pennsylvania,
issued a preliminary injunction against Pennsylvania's out-of-state ban on
circulators of referendum petitions to amend Home Rule Charters that govern
certain Pennsylvania municipalities.  Judge Hornak found the out-of-state
circulator ban imposed a severe restriction on protected First Amendment speech,
strict scrutiny applied, and the ban was not narrowly tailored to advance the
Commonwealth's interest when out-of-state circulators could more narrowly
submit to the jurisdiction of the Commonwealth rather than the unconstitutional
blanket ban on out-of-state circulators.  *Id*. at *1-3.

The Third Circuit finally had occasion to review out-of-state circulator bans
in 2018, when it reversed a New Jersey district court grant of a motion to dismiss
challenging New Jersey's out-of-state circulator ban for circulators of major party
candidate nominating petitions. The Third Circuit held that out-of-state circulator
bans severely impair First Amendment speech which triggered strict scrutiny
analysis.  *Wilmoth v. Secretary of State of New Jersey*, 731 Fed. Appx 97, 101-105
(3rd Cir., Apr. 19, 2018). In its unpublished opinion, the Third Circuit panel
explained that: "Our *Anderson-Burdick* inquiry in the instant case is quite
straightforward.  Since the turn of the century, 'a consensus has emerged' that laws
imposing residency restrictions upon circulators of nomination petitions "are
subject to strict scrutiny analysis."  *Id*. citing *Libertarian Party of Virginia v. Judd*,

718 F.3d 308, 316-17 (4th Cir, 2013); *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030-31 (10th Cir. 2008); *Nader v. Blackwell*, 545 F.3d 459, 475-76 (6th Cir. 2008); *Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008).  *See, Wilmoth*, 731 Fed. Appx at 102.  Following the Third Circuit's reversal of the district court's Rule 12 dismissal, and after lengthy discovery and briefing and a change of parties, Judge Sheridan of the New Jersey district court held New Jersey's ban on out-of-state residents for petition circulators for major party candidates unconstitutional on May 11, 2021.  *See Arsenault v. Way*, 3:16-cv-01854 (D. N.J. May 11, 2011)

Again, in Pennsylvania, Judge Kane of the United States District Court for the Middle District of Pennsylvania, held that Pennsylvania's ban on out-of-state circulators for major party candidate nomination petitions was unconstitutional as applied to out-of-state party members willing to submit to the jurisdiction of the Commonwealth.  *See Benezet Consulting, LLC v. Boockvar*, 433 F.Supp. 3d 670 (M.D. Pa. 2020).

Accordingly, strict scrutiny should be applied to Plaintiffs' challenge to AR Code § 7-9-103(a)(6) and Arkansas, could easily, and more narrowly than a blanket ban on non-residents, require all petition circulators to provide their current address and require out-of-state petition circulators to submit to the jurisdiction of Arkansas for the purpose of any post-filing investigation, prosecution and/or service of process as a narrower means to protect the state's legitimate interest in

serving process for any post-filing investigation.  Because Arkansas can more

narrowly advance its interest instead of a blanket ban on out-of-state residents, the

challenged residency requirement for initiative and referendum petition circulators

fails the required level of judicial review and is facially unconstitutional.

Therefore, Plaintiffs have not only stated a valid claim upon which relief can be

granted under the First and Fourteenth Amendments, but Plaintiffs will very likely

succeed on the merits of their claim against AR Code § 7-9-103(a)(6) and

Defendant's motion to dismiss Count I of Plaintiffs' complaint should be denied.

4.    Plaintiffs State a Valid First Amendment Claim Challenging the
Compensation Ban for Initiative and Referendum Petition Circulators
Imposed Under AR Code §§ AR Code 7-9-601(g)(1)-(4) and 7-9-
601(c).

Likewise, Plaintiffs' challenge to AR Code §§ 7-9-601(g)(1)-(4) and 7-9-

601(c) is governed by the Supreme Court's analysis in *Meyer* and *Buckley*.

Arkansas' ban on compensation to petition circulators based on the number of

valid petition signatures collected imposes a restriction which the best petition

circulators in the nation refuse to submit, thereby reducing the pool of available

petition circulators (in fact the best petition circulators) triggering strict scrutiny

analysis for which the state does not have a valid purpose to enforce.  In cases

where Plaintiffs have established a record showing similar state-imposed

compensation bans reduced the pool of available circulators, the challenged

compensation bans based on signature collected have been held unconstitutional.

In *On Our Terms '97 PAC v. Secretary of State of Maine*, 101 F.Supp.2d 19 (D. Me. 1999), the court upon review of a full record, held Maine's ban on the payment to circulators of initiative and referendum petitions compensation based on the number of signatures collected unconstitutional.  In *On Our Terms '97*, the relevant findings of fact established by the Court found that: (1) the pay-per-signature ban imposed uncertain costs and budget uncertainty on the initiative process decreasing the confidence that the signature collection effort would succeed (*Id*. at 23); (2) initiative petitions had qualified for the ballot under the pay-per-signature ban (*Id*. at 24); (3) collecting signatures for an initiative petition at the polls on Election Day makes it possible to conduct a successful petition drive relying entirely on volunteer circulators (*Id*. at 24); (4) the verification process does not permit adequate time to check for petition fraud (*Id.* at 24); (5) The Secretary of State argued the pay-per-signature ban was necessary to protect against petition signature fraud (*Id*. at 25); (6) no evidence of petition fraud in Maine was provided by the Secretary of State (*Id*. at 25); (7) there are disincentives for backers of initiatives to tolerate the commission of fraud (*Id*. at 25).  Despite evidence the pay-per-signature ban did not have the effect of halting initiative petitions and proponents could still qualify an initiative petition using just volunteer circulators, the Court in *On Our Terms '97*, held that:

> I am nonetheless persuaded that the Statute severely burdened the
> plaintiffs' attempts to mount the Pledge Drive, USTL and OOT, like

the plaintiffs in *Meyer*, had begun the process of collecting signatures when they made a judgment call, informed by personal experience with that process, that the state regulation in question posed a significant problem for their initiative campaign. The *Meyer* plaintiffs, judged that they would need the assistance of paid personnel to obtain the required number of signatures within the allotted time. *Meyer*, 486 U.S. at 417. USTL and OOT judged that the ban on payment per signature would undermine estimates on costs and time frames, threatening the success of the entire Pledge Drive effort. There was no need in either case for the plaintiffs to press their campaigns to completion to demonstrate the burdensome effect of the applicable state regulations.

During the Pledge Drive campaign OOT encountered difficulty recruiting and keeping circulators when offering to pay on an hourly basis. OOT and USTL had reason to believe, based on the personal experience of Jacob and Waters, that to the extent they were able to attract circulators to undertake this inherently stressful work, those workers would be less productive than if paid per signature. Finally, the Statute as worded left doubts in Michael's mind that he could ameliorate its effects by setting minimum standards or rewarding for productivity without subjecting himself to criminal prosecution.

For these reasons the Statute "limit[ed] the number of voices who [would] convey [plaintiffs'] message[,]…limit[ed] the size of the audience they [could] reach" and made it "less likely that [plaintiffs would] garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id*. at 422-23.

The statute, like the Colorado payment ban, did not completely stifle initiative and referendum activity in Maine, leaving open the possibility of conducting successful signature-gathering campaigns either via volunteers or employing "more burdensome" forms of paying professional circulators. *See id* at 424. That these avenues remained open does not alter the finding that the Statute heavily burdened protected speech.

…

> In light of the foregoing, I conclude and declare that under controlling
> United States Supreme Court precedent the Statute as applied to USTL,
> OOT and others similarly situated violates the First Amendment.  So
> ordered.

*On Our Terms '97* 101 F.Supp. 2d at 25-26.

Just as *On Our Terms '97* was instructed by the Supreme Court's decision in *Meyer* and *Buckley*, this action is properly instructed by the Supreme Court decisions in *Meyer* and *Buckley*.  While *Meyer* did not address the constitutionality of pay-per-signature bans, the analysis employed by the Supreme Court in *Meyer* that bans on compensation reduced the pool of available circulators was a severe impairment to protected speech triggering strict scrutiny analysis was properly extended by the Maine district court to the pay-per-signature ban at issue in *On Our Terms '97*.

Courts readily hold that election laws impose severe burdens, and are subject to strict scrutiny where, as here, they make it less likely that the proponent will gather the number of signatures required for the ballot (thereby preventing proponents from making the initiative issue a matter of focus in a statewide election), eliminate the persons who are best able to convey proponents' message, limit the number of persons who will convey the proponents' message, reduce the size of the audience proponents can reach, or otherwise increase the overall cost of signature gathering. *Buckley*, 525 U.S. at 194-95; *Meyer*, 486 U.S. at 422-24;

*Campbell v. Buckley*, 203 F.3d 738 (10th Cir. 2000); *Indep. Inst. v. Buescher*, 718 F.Supp.2d 1257, 1269-71 (D. Colo. 2010).

In *Meyer*, the Court struck down a Colorado statute which made it illegal to pay petition circulators. The statute, the Court concluded, imposed a burden on political expression that the state failed to justify. The Court held that the circulation of an initiative petition constitutes "core political speech," *id*. at 421-22, which was burdened in two ways by Colorado's ban on paying petition circulators:

> First it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id*. at 422-23. The Court further explained that:

> The State's interest in protecting the integrity of the initiative process does not justify the prohibition because the State has failed to demonstrate that it is necessary to burden appellees' ability to communicate their message in order to meet its concerns. The Attorney General has argued that the petition circulator has the duty to verify the authenticity of signatures on the petition and that the compensation might provide the circulator with a temptation to disregard that duty. No evidence has been offered to support that speculation, however, and we are not prepared to assume that a professional circulator – whose qualifications for similar future assignments may well depend on a reputation for competence and integrity – is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.

*Id*. at 426.

Based on *Meyer*, the district court in *Limit v. Maleng*, 874 F.Supp.1138 (W.D. Wash. 1994), invalidated a Washington statute which prohibited payment of petition circulators on initiative and referendum petitions on a per-signature basis. The State of Washington maintained that its statute was constitutionally permissible since, unlike the Colorado statute at issue in *Meyer*, Washington's statute did not totally ban the payment of signature gatherers but rather merely banned the per-signature payment of circulators and that its statute was thus narrowly focused, content-neutral regulation tailored to further the State's policy of protecting the integrity of the initiative process.  However, the court found that the State had failed to adduce "actual proof of fraud stemming specifically from the payment per signature method of collection," and thus the State had failed to sustain its burden to justify the legislation.  *Id*. at 1141.  The *Limit* Court rejected the argument that the State of Washington needed only to show that the legislation was based on the legislators' perception that payment per signature encouraged fraud.  Instead, in reliance on *Meyer*, the court held, "Unless there is some proof of fraud or actual threat to citizens' confidence in government which could provide a compelling justification, the right of public discussion of issues may not be infringed by laws restricting expenditures on referenda and initiative campaigns." *Id*. at 1141.

And again, based on a full record showing that even a partial ban on compensation based on the number of signatures collected severely impaired First Amendment speech, the Colorado district court found a ban limiting compensation to initiative and referendum petition circulators to 20% of total compensation reduced the pool of available circulators and increased both inefficiency and the cost of the petition drive while having no effect on either signature validity rates or the incidences of petition fraud held Colorado's partial ban on per-signature compensation unconstitutional under strict scrutiny analysis.  *See*, *Independence Inst. v. Gessler*, 936 F.Supp.2d 1256, 1259-73, 1275-81 (D. Colo. 2013).

However, in cases where the record failed to establish the requisite harm to First Amendment rights, partial compensation bans have been upheld.  *See e.g., Prete v. Bradbury*, 438 F.3d 949, 965 (9th Cir. 2006); *Bernbeck v. Gale*, 2011 WL 3841602 (D. Neb. Aug. 30, 2011); *Jaeger*.  However, plaintiffs have the right to establish a record sufficient to demonstrate that the challenged compensation ban limits the pool of available petition circulators, imposes a severe burden on protected First Amendment speech and should be struck down as unconstitutional under strict scrutiny analysis where the ban is not narrowly tailored to advance a compelling governmental interest.

Accordingly, Plaintiffs state a valid challenge to the Arkansas' per-signature compensation ban and the ultimate adjudication on the merits of Plaintiffs' claim

rests on the ability of Plaintiffs to establish a proper record of First Amendment

harm after full discovery.  As a result, Defendant's motion to dismiss Count IX of

Plaintiffs' complaint should be denied.

     5.    Plaintiffs' challenge to the disclosure requirement of paid circulators
imposed under AR Code §§ 7-9-601(a)(1), 7-9-601(a)(2)(C)(i) & (ii),
7-9-601(a)(2)(D) and 7-9-601(a)(3)(A) & (B) State a Valid First
<u>Amendment Claim</u>.

     Plaintiffs' challenged to Arkansas' requirement that sponsors of initiative

and referendum petition must disclose the names and addresses of all paid

circulators to Defendant Secretary of State is directly controlled by the United

States Supreme Court's decision in *Buckley*.  In *Buckley*, the Supreme Court

upheld the Tenth Circuit's ruling that Colorado's requirement for initiative and

referendum sponsors to report the names, addresses and compensation paid to

circulators was unconstitutional as such requirements invade the rights of

circulators to engage in anonymous speech warranting "exacting scrutiny."   The

Court in *Buckley* explained "In sum, we agree with the Court of Appeals appraisal:

Listing paid circulators and their income from circulation "forc[es] paid circulators

to surrender the anonymity enjoyed by their volunteer counterparts,' 120 F.3d at

1105; no more than tenuously related to the substantial interests disclosure serves,

Colorado's reporting requirements, to the extent that they target paid circulators,

'fail exacting scrutiny,' *Ibid*."  *Buckley*, 525 U.S. at 204.

Defendant, interestingly, avoid any discussion of *Buckley* with respect to this challenge.  Instead, Defendant's brief attempts to equate the right to know who signed a petition, thereby placing a ballot question on the ballot, with the person merely offering the petition to be signed by the voter as a basis to dismiss Plaintiffs' challenge.  The two are simply not the same and the case law supporting public inspection, which does serve the state's interest to police petition fraud is not cognate with public disclosure of individuals who are merely offering the voter an opportunity to sign a petition and, therefore, such disclosure of their names and addresses have nothing to do with the policing of petition fraud. *See Buckley*, 525 U.S. at 203-04.

While the challenged disclosure requirements do not extend to the disclosure of the amount paid to professional circulators, the requirement nevertheless targets the central infirmity addressed by *Buckley* – the challenged statutes require paid circulators to "surrender the anonymity enjoyed by their volunteer counterparts." Therefore, Plaintiffs state a valid claim, sufficient to prevail on a motion for summary judgment with respect to their First and Fourteenth Amendment challenge to Arkansas Code Sections 7-9-601(a)(1), 7-9-601(a)(2)(C)(i) & (ii), 7-9-601(a)(2)(D) and 7-9-601(a)(3)(A) & (B).  Accordingly, Defendant's motion to dismiss Claim X must be denied.

B.   Plaintiffs State Valid Claims Under the Equal Protection Clause of the
     <u>Fourteenth Amendment to the United States Constitution</u>.

    1.   Plaintiffs State a Valid Claim that the County-Based Distribution
          Requirement Imposed on Referendum and Initiative Petition Signatures
          by Arkansas Code §§ 7-9-108 (a)-(d) Impair Rights Guaranteed to
          Plaintiffs Under the Equal Protection Clause of the Fourteenth
          <u>Amendment to the United States Constitution</u>.

Arkansas Code § 7-9-108(a) provides:

Each initiative or referendum petition ordering a vote upon a measure
having general application throughout the state shall be prepared and
circulated in fifteen (15) or more parts or counterparts, and each shall
be an exact copy or counterpart of all other such parts upon which
signatures or petitioners are to be solicited.  When a sufficient number
of parts are signed by a requisite number of qualified electors and are
filed and duly certified by the Secretary of State, they shall be treated
and considered as one (1) petition.

Arkansas Code § 7-9-108(d), in turn, provides:

No part of any initiative or referendum petition shall contain signatures
of petitioners from more than one (1) county.

AR Code § 7-9-108(a), (d) (2016).  Accordingly, the challenged statute requires

Arkansas citizens residing in counties with larger populations to rely on citizens

residing in smaller counties to place an initiative and referendum question on the

ballot in violation of the "one man, one vote" principal of the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution.

    Furthermore, the "2020 Initiatives and Referenda Handbook – Facts and

Information for the 2020 General Election" (hereinafter the "Handbook" relevant

portions of which are attached hereto as Exhibit A") promulgated by Defendant

Secretary of State provides at page 2 that the signature requirement for a

constitutional amendment was 89,151 signatures for a constitutional amendment,

71,321 signatures for an initiative act and 53,491 signatures for a referendum and

which must include within these signature requirement that: "there must be

sufficient signatures from 15 different counties; see attached spreadsheet, pages

60-61"  The referenced spreadsheet on pages 60 and 61 details that hundreds or

thousands of the required total number of signatures must be collected from at least

each of fifteen different counties (i.e. Plaintiffs cannot not collect 1 signature from

14 different counties and the rest from the largest county in Arkansas, they must

severely distribute the collection of hundreds and thousands of signatures from at

least each of a minimum of 15 different counties counties).

More than 45 years ago, the Supreme Court struck down the state of Illinois'

county-based signature distribution requirements on the ground that they violate

the "one man, one vote" principle as applied to ballot access regulations, and thus

deny voters in more populous counties the equal protection of law guaranteed by

the Fourteenth Amendment.  *See Moore v. Ogilvie*, 394 U.S. 814, 818-19 (1969).

Since then, no fewer that 13 federal courts have relied on *Moore* to invalidate other

states' county-based signature distribution requirements.  Based on this line of

precedent, it is a matter of settled law the challenged signature distribution

requirements imposed by Defendant and Arkansas Code § 7-9-108(a), (d) on the

collection of initiative and referendum petition signatures in Arkansas are unconstitutional – especially where the number of signatures required to be collected in each of at least 15 different counties is as significant as detailed by the Handbook.

In *Moore*, independent candidates for President and Vice President challenged an Illinois law requiring that they submit a nomination petition containing the signatures of 25,000 qualified voters, including "the signatures of 200 qualified voters from each of at lease 50 counties." *Id*. at 815.  At the time, 93.4 percent of the state's voters resided in its 49 most populous counties, where as only 6.6 percent resided in the remaining 53 counties.  *See id*. at 816.  The county-based distribution requirement thus diluted the power of voters in more populous counties to nominate candidates relative to the power of voters in less populous counties.  *See id*.

Before addressing the merits of the Illinois law, the Court rejected the state's preliminary objection that the case was non-justiciable.  The Court reasoned: "When a State makes classifications of voters which favor residents of some counties over residents of other counties, a justiciable controversy is presented." *Id*. at 817 (citing *Baker v. Carr*, 369 U.S. 186, 198-204 (1962)).  The Court then found the controversy to fall squarely in line with its recent decisions in legislative apportionment cases.  Relying on that line of precedent, it had no trouble

concluding that Illinois' county-based distribution requirement violated the Equal

Protection Clause:

> How then can one person be given twice or ten times the voting power
> of another person in a statewide election merely because he lives in a
> rural area or because he lives in the smallest rural county?  Once the
> geographical unit for which a representative is to be chosen is
> designated, all who participate in the election are to have an equal vote
> – whatever their race, whatever their sex, whatever their occupation,
> whatever their income, and whatever their home may be in that
> geographical unit.  This is required by the Equal Protection Clause of
> the Fourteenth Amendment.

*Id*. at 817 (quoting *Gray v. Sanders*, 372 U.S. 368, 379 (1963) (striking down

Georgia's county-unit system in statewide primary elections).  As the Court

explained, "the right of suffrage can be denied by a debasement or a dilution of the

weight of a citizen's vote just as effectively as by wholly prohibiting the free

exercise of the franchise."  *Id*. at 818 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555

(1964)).

Applying these principles to the Illinois statute, the Court found the county-

based distribution requirement it imposed suffered the same defect as the statutory

schemes struck down in the Court's reapportionment cases.  The law made it

impossible for the electorate in 49 counties containing 93.4 percent of the state's

registered voters to form a new political party and place their candidates on the

ballot, while enabling only 25,000 of the remaining 6.6 of registered voters to do

so.  *See id*. at 819.  It "thus discriminates against the residents of the populous

counties of the State in favor of rural sections." *Id*.  In view of such

discrimination, the Court expressly rejected the state's asserted justification for the

law, that it was intended to ensure "statewide support" for new political parties.

*See id*. at 818-19.  "This law applies a rigid, arbitrary formula to sparsely settled

counties and populous counties alike," the Court observed, "contrary to the

constitutional theme of equality among citizens in the exercise of their political

rights." *Id*.  Because the law granted greater voting strength to certain groups over

others, the Court concluded, it "is hostile to the one man, one vote basis of our

representative government." *Id*. at 819.  As applied to the challenged Arkansas

law, the population of the 14 most populous counties representing 1,863,000

citizens of Arkansas' estimated 3,018,000 total population or 61.74% of the state's

population cannot place an initiative or referendum question on the ballot while the

remaining 38.26% of the population residing in the other 61 counties may do so

with the support of anyone on the other 14 most populous counties.[2]

A few months after the Supreme Court decided *Moore*, a federal court in

Michigan struck down that state's county-based distribution requirement.  *See*

*Socialist Workers Party v. Hare*, 304 F.Supp. 534 (E.D. Mich. 1969).  Michigan's

---

[2] The 14 most populous counties are populated by 1,863,289 citizens (Pulaski, 392,967; Benton, 265,759; Washington, 232,289; Sebastian, 127,591; Faulkner, 123,624; Saline, 119,415; Craighead, 107,345; Garland, 98,555; White, 78,762; Lonoke, 72,528; Jefferson, 69,282; Pope, 63,761; Crawford, 62,739; and Crittenden, 48,672)

law required that a new political party submit nomination petitions with signatures equal to at least 1 percent of the votes cast for the last successful candidate for secretary of state, and that "the petitions shall be signed by at least 100 residents in each of at least 10 counties of the state and not more than 35% of the minimum required number of the signatures may be by resident electors of any one county." *Id*. at 535.  In holding the provision unconstitutional, the Court rejected the state's attempts to distinguish it from the distribution requirement struck down in *Moore*. That the Michigan statute required signatures from only 10 counties, whereas the Illinois statute in *Moore* required signatures from 50 counties, was "of no constitutional significance," the Court found.  *See id.* at 536.  The law still applied "a rigid, arbitrary formula," in violation of the "one man, one vote" principle.  *Id*. (quoting *Moore*, 394 U.S. at 818).  Similarly, it was not relevant that the Michigan statute imposed a lesser burden on new political parties than the Illinois statute, because the rights protected in *Moore* were those of "*voters to equality in the exercise of their political rights*."  *Id*. (emphasis in the original).  *Moore* establishes "a clear mandate," the Court concluded, and thus enjoined the Michigan statute. *See id*.

The constitutionality of county-based distribution requirements next arose in New York, which required independent candidates for statewide office to submit a nomination petition signed by at least 12,000 voters, "of whom at least fifty shall

reside in each county of the state, and counties of Fulton and Hamilton to be considered as one county." *See Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984, 986 (S.D. N.Y. 1970).  The Court invalidated the distribution requirement finding it "constitutionally indistinguishable from the Illinois statute" struck down in *Moore*. *Id*. at 991.  Once again, the problem was the statute's use of a "rigid, arbitrary formula," which applied to "sparsely settled counties and populous counties alike." *See id*. at 990 (citing *Moore*, 394 U.S. at 818-19).  "By overweighting and overvaluing the votes of those living in less populated counties," the Court found, "the votes of the majority of the electorate have been diluted and undervalued." *Id*. at 990-91 (citing *Reynolds*, 377 U.S. at 563).  Such discrimination, the Court held, "is constitutionally impermissible." *Id*. at 991.

That same year, a federal court struck down Ohio's requirement that independent candidates for statewide office submit nomination petitions with "the signatures of at least two hundred electors from each of at least thirty counties," and further provided that "no more than one fourth of [the signatures] needed" could come from any one county. *See Sweetenham v. Rhodes*, 318 F.Supp. 1262, 1271 (S.D. Ohio 1970).  Such a distribution requirement, the Court found, "results in a marked dilution of the voting strength of urban voters as opposed to rural voters, violating the principle of one man, one vote." *Id*. (citing *Gray v. Sanders*, 372 U.S. 368 (1963); *Reynolds*, 377 U.S. 533).  The Court thus relied on the same

reasoning in *Moore* as the Courts had in *Hare* and *Rockefeller*, and held Ohio's

distribution requirement unconstitutional.  *See id*. at 1272 (citing *Moore*, 394 U.S.

at 818-19).

The county-based distribution requirement in Massachusetts was next to fall.

*See Baird v. Davoren*, 346 F.Supp. 515 (D. Mass. 1972).  The Massachusetts law

required that a new political party submit a nomination petition containing

signatures equal in number to the entire vote cast for governor in the previous

election, and that "no more than one third of the signatures shall be from any one

county."  *Id*. at 517-18.  Once again, the Court found that such a distribution

requirement "has the effect of discriminating between voters in the populous and

sparsely settled counties of the state, and limit the rights of voters from the most

populous counties."  *Id*. at 522.  Accordingly, the Court held the Massachusetts law

to be contrary to the "one man, one vote" principle, and thus in violation of the

Equal Protection Clause.  *See id*. (citing *Moore*, 394 U.S. at 819; *Gray*, 372 U.S at

381; *Hare*, 304 F.Supp. at 534).

The issue again next arose again in Illinois, which had enacted a successor

statute to the one struck down in *Moore*.  This statute required that political parties

seeking statewide ballot access submit a nomination petition with signatures from

at least 25,000 qualified voters, "not more than 13,000 of which may be counted

from any one county."  *Communist Party of Illinois v. State Bd. of Elections*, 518

F.2d 517, 518 (7th Cir. 1975). "This two-county requirement," the Seventh Circuit concluded, "like the fifty-county requirement in *Moore*, 'discriminates against the residents of the populous counties of the state in favor of rural sections.'" *Id*. at 521 (quoting *Moore*, 394 U.S. at 819). The Court therefore held the law unconstitutional on equal protection grounds. *See id*. at 521-22.

Next, the federal district court in Rhode Island struck down that state's county-based distribution requirement, even though the law only required an independent candidate from president to submit a nomination petition with 1,000 signatures, including "25 from each of the five counties in the state." *See McCarthy v. Garrahy*, 460 F.Supp. 1042, 1043 (D. R.I. 1978). The relatively minor burden imposed by the Rhode Island statute was "irrelevant," the Court concluded. *Id*. at 1050. What mattered was that the statute, like those in all the other cases following the Supreme Court's decision in *Moore*, "dilutes the value of the votes of those living in more populous counties in favor of those living in less populous counties." *Id*. at 1046. Therefore, the Court reasoned, "the principle of *Moore* is implicated and the statute can be upheld only by a showing that it promotes a compelling state interest." *Id*. at 1050. Finding no such interest, the Court permanently enjoined the state from enforcing the distribution requirement. *See id*.

In each of the foregoing cases, federal court either explicitly or implicitly applied strict scrutiny analysis to invalidate the challenged county-based signature distribution requirements.  Without belaboring the point, however, it is worth noting that more recent decisions have also invalidated county-based signature distribution requirements under the more flexible analysis the Supreme Court prescribed for review of some ballot access laws in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  *See e.g.*, *Blomquist v. Thompson*, 739 F.2d 525, 526 (10th Cir. 1984) (applying *Anderson* analysis to strike down Wyoming's county-based distribution requirement); *Libertarian Party of Nebraska v. Beerman*, 598 F.Supp. 57, 61 (D. Neb. 1984) (applying *Anderson* analysis to strike down Nebraska's county-based distribution requirement).  More importantly, and more recently, several courts have predictably relied on this same line of precedent to invalidate county-based signature distribution requirements for ballot initiatives.  *See e.g.*, *ACLU of Nevada v. Lomax*, 471 F.3d 1010 (9th Cir. 2006); *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003); *Montana Public Interest Research Group v. Johnson*, 361 F.Supp. 2d 1222 (D. Mont. 2005); *Gallivan v. Walker*, 54 P.3d 1069 (Utah Supreme Ct. 2002).

Accordingly, Plaintiffs' challenge to Arkansas' county-based signature distribution requirement not only states a cognizable claim upon which relief can be granted, it advances a claim most likely to succeed on the merits.  Arkansas has

every ability to impose a valid distribution scheme based on apportioned districts such as congressional and/or state legislative districts, in such a manner that there is no dilution of political rights of residents of Arkansas' more populous counties – a distribution scheme which does not run afoul of equal protection concerns and which has been uniformly upheld by state and federal courts.  Arkansas simply cannot impose signature distribution requirements based on unapportioned geographic units such as the county unit.

Defendant argues that Plaintiffs' challenge to the county distribution requirement is defective because they did not also challenge the cognate constitutional provision of Article V, Section 1 because the constitutional provision which is identical to the challenged statutory provision is self-executing, rendering the statutory challenge ineffective.  Plaintiffs agree that the state constitutional provision is identical to the statutory provision challenged in this action.  It is because the state constitutional provision is sufficiently identical to the statutory provision that Plaintiffs are requesting to be both enjoined and declared unconstitutional that it is not necessary to also include the state constitutional provision as a separate challenge.   The declaratory effect that the challenged statutory provisions of Arkansas Code Sections 7-9-601(a)(1), 7-9-601(a)(2)(C)(i) & (ii), 7-9-601(a)(2)(D) and 7-9-601(a)(3)(A) & (B) would extend to also render the state constitutional provision unenforceable under the declaratory and

injunctive relief requested in Plaintiffs' Amended Complaint.  *See* Amend. Compl. at pp. 55-56, ¶¶ (k), (n).  Furthermore, if this Court determines that the state constitutional provision also needs to be declared unconstitutional and enjoined in order to provide complete relief, it can do so under Plaintiffs' prayer for relief that this Court "grant Plaintiffs such other relief which may, in the determination of this Honorable Court, be necessary and proper."  *See*, Amend. Compl. at p. 56, ¶ (r). Further, at least one federal district court has not found the failure to specifically challenge cognate state constitutional provisions fatal to a challenge to the statutory provision.  In *We the People PAC v. Bellows*, 2021 WL 569039 (D. Me., Feb. 16. 2021), the district court issued a preliminary injunction against Maine's statutory voter registration and residency requirement to circulate initiative and referendum petition in Maine, despite the fact that the cognate state constitutional provision was not also challenged. *See*, *We the People PAC v. Bellows*, 2021 WL 569039 (D. Me., Feb. 16. 2021) (Attached hereto as Exhibit A).  However, if this Court determines that Plaintiffs must challenge all state constitutional provisions which relate to challenged statutory provisions, despite Plaintiffs' above stated argument, Plaintiffs respectfully request that leave be granted to file a Second Amended Complaint to correct this technical defect as such an amendment would clearly not be futile and so leave should be freely granted.

Accordingly, Defendant's motion to dismiss Count XI as to Plaintiffs' challenge to Ar. Code § 7-9-108 (a), (d) (2016) must be denied, or in the alternative, leave to include a challenge to the related state constitutional provisions in a Second Amended Complaint.

2.   Plaintiffs' State a Valid Equal Protection Claim Challenging Application of AR Code §§ 7-9-601(a)(2)(E)-(G) and 7-9-601(d)(3)(i) & (ii) to Paid Petition Circulators and Not to Volunteer Petition <u>Circulators</u>.

Defendant's argument to dismiss Plaintiffs' equal protection claim against AR Code §§ 7-9-601(a)(2)(E)-(G) and 7-9-601(d)(3)(i) & (ii) ignores that the circulation of initiative and referendum petition implicates a fundamental right in "core political speech" protected under the First and Fourteenth Amendments to the United States Constitution.  AR Code § 7-9-601(a)(2)(E) & (G) requires paid petition circulators to provide information to sponsors of initiative and referendum campaigns so that the sponsors may conduct the required criminal history and record check on the paid petition circulator. This requirement is not imposed on the use of volunteer petition circulators.  AR Code § 7-9-601(d)(3)(i) & (ii) requires a paid petition circulator to sign a statement taken under oath or solemn affirmation stating that the paid circulator has not plead guilty or nolo contender to or been found guilty of a disqualifying offense (listed in the challenged statute) in any state of the United States, the District of Columbia, Puerto Rico or any other United

States protectorate.  Again, AR Code § 7-9-601(d)(3)(i) & (ii) is not applied to volunteer petition circulators.

Accordingly, the disparate treatment of similarly situated groups – paid circulators vs. volunteer circulators, in the exercise of a fundamental right – the circulation of initiative and referendum petition, states a valid claim under the Equal Protection Clause of the Fourteenth Amendment to which strict scrutiny analysis is applied. *See Maher v. Roe*, 432 U.S. 464, 470 (1977).  On its face, the challenged statutes violate equal protection concerns.  Suspect classifications are not necessary to state a valid equal protection claim when a fundamental right is implicated.

Further, Defendant makes no effort to explain why the alleged state interest in support of the mandated criminal history and record check and the required statement from paid petition circulators advances a state interest whereas the same interest is not present for a volunteer criminal petition circulator. The answer to the foregoing, Plaintiffs would suggest, is that state legislatures hate the loss of their exclusive power to legislate to the People, and they fully understand that the use of paid, professional petition circulators is often the best mechanism for initiative and referendum proponents to secure ballot access for their ballot questions.  It is precisely because paid petition circulators are so efficient and so successful in permitting the citizens of Arkansas to circumvent an unresponsive state

government that Arkansas seeks to impose all manner of additional restrictions on paid, out-of-state petition circulations, and why they do not impose the same restrictions on often inept, and certainly inefficient, volunteer petition circulator who do not threaten the legislature's otherwise exclusive legislative power to legislate.

In any event, Plaintiffs state a valid claim under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution with respect to the requirement that only paid petition circulators must provide information to initiative and referendum sponsors so that they can obtain the mandatory criminal history and record check mandated by AR Code § 7-9-601(a)(2)(E)-(G). Accordingly, Defendant's motion to dismiss Counts IV and VII should be denied.

C.   Plaintiffs State a Valid Claim That AR Code § 7-9-601(d)(3)(i) & (ii) Violates the *Ex Post Facto* Clause of Article I, §10 of the United States <u>Constitution</u>.

AR Code § 7-9-601(d)(3)(i) & (ii) prohibits any paid circulator who has committed any offense on a newly promulgated list of "qualifying offenses" from circulating initiative and referendum petition in the state of Arkansas.  It has long been established that government acts preventing an individual from engaging in a professional pursuit because of some prior act which was not a disqualifying act when committed constitutes a punishment in violation of the *Ex Post Facto* Clause.

In *Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1867), the Supreme Court held a statute that prescribed as a qualification for practice before the federal courts an oath that the attorney had not participated in the Rebellion (i.e. on behalf of the Confederate government in the Civil War) was found unconstitutional in violation of the *Ex Post Facto* Clause because it operated as a punishment for past acts.  In the instant action, that is exactly what AR Code § 7-9-601(d)(3)(i) & (ii) seeks to accomplish.  It imposes a punishment, denial of the ability to circulate initiative and referendum petitions in Arkansas, for past acts which, at the time they were committed, did not bar the circulator from engaging in the circulation of initiative and referendum petitions in Arkansas.  Conduct, we remind the Court is not just an occupation, but the exercise of "core political speech" under the First Amendment to the United States Constitution.  The challenged statute fails to act prospectively in conformance with the *Ex Post Facto* Clause, but instead, seeking imposes new punishment for acts committed before the challenged statute was passed into law.  Accordingly, Plaintiffs state a valid claim under the *Ex Post Facto* Clause as applied to "disqualifying acts" committed before the passage of the challenged statute such that Defendant's motion to dismiss Count VIII should be denied.

D.     Defendant's Motion to Dismiss Count V of Plaintiff's Amended Complaint Should be Denied.

The determination of whether the requirements of Arkansas Code Sections 7-9-601(a)(2)(E)-(G) and 7-9-601(b)(1), (4) & (5) violate rights guaranteed to

Plaintiffs under the First and Fourteenth Amendments, just as in Plaintiffs' claims against the state residency requirement to circulator initiative and referendum petition and the challenged compensation ban based on the number of signatures collected, discussed above, rest on the development of a factual record and, therefore, cannot be dismissed on a 12(b)(6) motion to dismiss. The question as to whether the requirement that paid canvassers must provide initiative and referendum sponsors information to permit the sponsor to obtain a criminal history and record on the paid canvasser within (30) days before the date that the paid canvasser begins to collect signatures and requires the sponsor of an initiative and/or referendum to obtain a criminal history and criminal record report for paid canvassers and to contact "the appropriate authority in the state or jurisdiction if a paid canvasser's criminal history and criminal record indicate an open or pending criminal charge that constitutes a 'disqualifying offense' to determine the ultimate disposition or current status of the charge" - all at the expense of the sponsor, imposes a severe burden on the First Amendment speech of Plaintiffs is a question which requires the development of an extensive factual record before the validity of Plaintiffs' claim can be adjudicated, all of which cannot be properly resolved on a 12(b)(6) motion to dismiss.

Accordingly, Defendant's motion to dismiss Count V of Plaintiffs Amended Complaint should be denied.

E.      Defendant's Motion to Dismiss Counts III of Plaintiffs' Amended
        <u>Complaint Should be Denied</u>.

Similarly, the question as to whether the provisions of Arkansas Code

Section 7-9-109(f)(1) imposes an impermissible chill on First Amendment speech

turns on the development of a factual record which cannot be resolved on a motion

to dismiss.  Count III complains that the statute which makes is Class D felony for

the sponsor, sponsor's agent or representative to pay a canvasser for petitioner

signatures on a petition part not personally witnesses by the paid canvasser; or (not

and) knowingly submits to the Secretary of State a petition part where the verifying

canvasser has not witnessed each signature on that petition part.

First, the Class D felony liability imposed by the challenged statutory

provision on sponsor, sponsor's agent or representative is not imposed if the

sponsor submits signatures to the Secretary of State collected by volunteers that are

not properly witnessed.  The targeting of signatures collected by a paid canvasser

which may create criminal, felony liability, for a sponsor, and not the witnessing of

signatures collected by volunteer canvassers, clearly imposes a chill on sponsors to

exercise their constitutional right, under the First Amendment to hire paid

canvassers.

Second, the chill on First Amendment speech through the use of paid

canvassers is augmented because the statute is vague as to whether criminal

liability also attaches if the sponsor pays the canvassers for poorly witnessed

signatures which the sponsor thereafter crosses out and does not submit to the

Secretary of State.  Accordingly, hiring a canvasser, and paying the canvasser for

all signatures collected and thereafter deleting any signature that the sponsor

determines should not be submitted to the Secretary of State may nevertheless also

trigger criminal liability which imposes a chill on the sponsor to use paid

canvassers as is the sponsor's right under the First Amendment.

All of which requires a factual record to establish.  Accordingly,

Defendant's motion to dismiss Count III of Plaintiff's Amended Complaint should

be denied.

F.      Defendant's Motion to Dismiss Count VI of Plaintiff's Amended Complaint
        Should Be Denied.

The requirements imposed on all Plaintiffs to either provide information

and/or conduct criminal records check for paid circulators violates the

unconstitutional conditions doctrine. Arkansas:

> [M]ay not impose conditions which require the relinquishment of
> constitutional rights.  If the state may compel the surrender of one
> constitutional right as a condition of its favor, it may, in like manner,
> compel a surrender of all.  It is inconceivable, that guaranties [sic]
> embedded in the Constitution of the United States may thus be
> manipulated out of existence.

*Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583, 594 (1926).

It is because the provisions of Arkansas Code Sections 7-9-601(a)(2)(E)-(G)

and 7-9-601(B)(5) are only imposed on the use of and on paid canvassers, and not

volunteer canvassers, the sponsor must relinquish the right under the First Amendment to use paid canvassers if the sponsor deems the requirements of the challenged provisions too onerous.  Likewise, a canvasser must forgo the right to receive compensation under the First Amendment to collect signatures for an initiative and/or referendum petition if he/she does not want to submit to the requirements necessary to undergo a criminal history check.  Accordingly, the provisions of Arkansas Code Sections 7-9-601(a)(2)(E)-(G) and 7-9-601(B)(5) impose an condition on the exercise of speech protected under the First Amendment in clear violation of the unconstitutional conditions doctrine.  Accordingly, Defendant's motion to dismiss Count VI of Plaintiffs' Amended Complaint should be denied.

G.    Plaintiffs State Valid State Law Claims

In violation of Article V, Section 1 of the Arkansas State Constitution, Arkansas Code Sections 7-9-103(a)(6), 7-9-109(f)(1), 7-9-601(a)(2)(E)-(G) and 7-9-601(b)(5) impair the right of any person or persons to circulate initiative and/or referendum petitions in the state of Arkansas.  Accordingly, on its face, the provisions violate the Article V, Section 1 of the state constitution.  If the state of Arkansas wants to impose these statutory restrictions, it must first further amend Article V, Section 1 to permit such further regulation on who may circulate

initiative and referendum petitions in Arkansas.  Accordingly, Defendant's motion

to dismiss Count XII of Plaintiffs Amended Complaint should be denied.

Furthermore, Count XIII of Plaintiffs' Amended Complaint also states a

valid claim that Arkansas Code Sections 7-9-601(c) and 7-9-601(g)(1)-(4) violates

Article V, Section 1 of the state constitution as impairing the absolute right that

"no law shall be passed to prohibit any person or persons from giving or receiving

compensation for circulating petition…."  Clearly, the ban on paid circulators

imposed under these challenged provisions is in direct affront to Article V, Section

1 of the state constitution – and the state legislature knew full well that these

provisions violate Article V, Section 1 of the state constitution.  This is evident

from the effort to pussy foot around the constitutional text by trying to limit

compensation only for the collection of signatures rather than for the circulation of

petitions.  The only purpose and the only act of circulating a petition is the

collection of signatures.  That is self-evident from any intelligent individual, save

for the politicians perched in the state capitol building.  In any event, at minimum,

a factual record must be developed by Defendant to show how circulating a

petition is different from the collection of signatures on that petition; and Plaintiffs

must be given the opportunity to demonstrate by a factual record how idiotic the

attempted distinction is in the failed effort by the legislature to circumvent the clear

text of Article V, Section 1 of the state constitution.  Accordingly, Defendant's

motion to dismiss Count XIII of Plaintiffs' Amended Complaint should be dismissed.

H.      Plaintiffs' Do Not Oppose the Dismissal of Count II of the Amended Complaint.

Plaintiffs included Count II of the Complaint and Amended Complaint for the sole purpose of forcing the state to make representations as to the exact application and definition of what constitutes a proper "witness" such that Arkansas is estopped in the future from taking a different position at the time of validating petition signatures.  That purpose has been accomplished, such that Count II can be dismissed.

III.    **CONCLUSION**

For all the aforementioned stated reasons, Defendant's motion to dismiss Counts I, III, IV, V, VI, VII, VIII, IX, X, XI, XII and XIII should be denied. Count II should be dismissed.  And, to the extent that any claim, other than Count II, is found to be defective for lack of pleading and challenging a cognate state constitutional provision, Plaintiffs respectfully request leave to file a Second Amended Complaint for the express purpose of curing any such pleading defect.

Dated:  September 27, 2021                 Respectfully submitted,

W. Whitfield Hyman                        Paul A. Rossi
Arkansas Bar #2013237                     Pennsylvania Bar #84947
*Counsel for Plaintiffs*                  *Counsel for Plaintiffs*
King Law Group, PLLC                      Admitted *Pro Hac Vice*
300 North 6th Street                      IMPG Advocates

Fort Smith, Arkansas 72901
Phone:  479.782.1125
Fax:  479.316.2252
Hyman@ArkansasLawKing.com

316 Hill Street, Suite 1020
Mountville, PA  17554
Phone:  717.961.8978
Paul-Rossi@comcast.net

## <u>CERTIFICATE OF SERVICE</u>

Plaintiffs, by and through their undersigned legal counsel, hereby certify that on this date they filed the foregoing brief in partial opposition with the Clerk of this Court through the court's ECF filing system and that opposing counsel was automatically served a true and correct copy of same as all opposing counsel are registered ECF filers and automatically receive notice of all electronic filing in the above captioner action.

Dated:  September 27, 2021    Paul A. Rossi
                   Pennsylvania Bar #84947
                   *Counsel for Plaintiffs*
                   Admitted *Pro Hac Vice*