# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

LIBERTY INITIATIVE FUND; U.S. TERM
LIMITS; ARKANSAS TERM LIMITS;
TIMOTHY DANIEL JACOB; TRENTON
DONN POOL; ACCELEVATE 2020, LLC; AND
LAWRENCE COOK;                                                              PLAINTIFFS,

v.                              **Case No. 4:21-cv-00460-JM**

JOHN THURSTON, IN HIS OFFICIAL CAPACITY AS
THE SECRETARY OF STATE FOR THE STATE OF
ARKANSAS,                                                                    DEFENDANT.

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument .............................................................................................................. 1

   I.   Plaintiffs lack standing as to some of their claims. ................................... 1

   II.  Arkansas's regulations do not violate the First Amendment. ................... 3

       A.  Residency requirement .................................................................... 4

       B.  Criminal-record prohibition and background-check requirement .............. 6

       C.  Compensation regulation ................................................................. 7

       D.  Canvasser disclosure requirement ..................................................... 8

   III. The witness-fraud prohibition does not impermissibly chill speech. .................. 9

   IV. Arkansas's regulations do not violate equal protection. ......................... 10

       A.  Criminal-record prohibition and background-check requirement ............ 10

       B.  The fifteen-county requirement does not violate "one man, one vote." ........ 11

   V.  The background-check requirement does not impose an unconstitutional condition on working as a paid canvasser. ......................................... 13

   VI. Plaintiffs' *ex post facto* claim is meritless. ........................................ 13

   VII. Arkansas's regulations do not violate the state constitution. ................... 14

Conclusion ........................................................................................................ 15

**INTRODUCTION**

Plaintiffs challenge a bevy of commonsense regulations of Arkansas's initiative and referendum process. This important tool of popular sovereignty allows the People of Arkansas to propose initiated legislation, referenda, and constitutional amendments. Given the gravity of that responsibility, the Arkansas Constitution imposes regulations on the petitioning process and directs the Arkansas General Assembly to enact further regulations as necessary to protect that process and ensure that the voices of Arkansans aren't cancelled out by well-heeled out-of-state interests, narrow geographic interests, or fraud.

Plaintiffs' scattershot claims fail as a matter of law and require no factual development. Far from demonstrating the opposite, Plaintiffs' response to the motion to dismiss largely ignores binding precedent and rests on convoluted theories that would require this Court to stretch basic legal principles beyond recognition. Indeed, much of Plaintiffs' response refutes itself. This Court has everything it needs to decide Plaintiffs' claims, and it should dismiss this case.

**ARGUMENT**

**I.      Plaintiffs lack standing as to some of their claims.**

Plaintiffs lack standing to challenge several statutory provisions, the effects of which are independently required by unchallenged state constitutional provisions. Plaintiffs must, at a minimum, show they face an injury that is "fairly traceable to the challenged" statutory provisions, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), and "that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiffs don't make that showing, and their claims fail as a matter of law.

Plaintiffs ask this Court to enjoin the statutory provisions implementing the witness-fraud prohibition (Ark. Code Ann. 7-9-109(e)-(f)) and fifteen-county requirement (Ark. Code

1

Ann. 7-9-108).  Yet as explained at-length in Arkansas's motion to dismiss, those statutory pro-visions mirror underlying constitutional requirements that Plaintiffs have affirmatively to de-clined challenge.  *See* Ark. Const. art. 5, sec. 1; Br. in Supp. of Mot. to Dismiss, ECF No. 15 at 11-12.  Consequently, even if Plaintiffs could somehow prevail on their statutory challenges and this Court were to enjoin those statutory provisions, Plaintiffs would still be subject to the un-challenged constitutional provisions.  Even on Plaintiffs' own theory, then, an injunction would fail to redress the injury purportedly caused by the challenged statutory requirements.  *See Arizo-nans for Fair Elections v. Hobbs*, Order, No. 20-15719 (9th Cir. May 5, 2020), ECF No. 37 at 1-2 ("Appellants, having failed to challenge the Arizona constitutional requirement of in-person signatures, cannot get the redress from the court they now seek by only challenging the statute at issue.").  Plaintiffs' claims thus fail as a matter of law and should be dismissed.

Plaintiffs' decision not to challenge the state constitutional provisions, moreover, isn't an oversight.  Defendant highlighted this deficiency in his motion to dismiss Plaintiffs' first com-plaint, ECF No. 7 at 11-12, and yet, Plaintiffs still failed to include a challenge to the state con-stitutional provisions in their amended complaint, ECF No. 9.  Recognizing that, Plaintiffs at-tempt to salvage their claims by insisting that because they've asked for "such other relief" as the Court may deem appropriate, the Court could simply reach out and enjoin parts of the State's basic laws that they declined to challenge.  Resp. at 38.  But a federal court "only has equitable power to grant relief on 'the merits of the case or controversy before it,' and 'does not have the authority to issue an injunction' 'based on claims not pled in the complaint."  *LA Alliance for Human Rights v. Cnty. of Los Angeles*, --- F.4th ---, 2021 WL 4314791, at *7 (9th Cir. Sept. 23, 2021) (quoting *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015)); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) ("[A] party moving for a

preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."). Hence, this Court isn't empowered to enjoin provisions that aren't before it.

At best, to support their argument, Plaintiffs purport to rely on a single out-of-circuit district court decision enjoining statutory petitioning regulations despite the existence of analogous state constitutional provisions. Resp. at 38 (citing *We the People PAC v. Bellows*, 519 F.Supp.3d 13 (D. Me. 2021). But even that case doesn't support Plaintiffs' argument because it didn't consider a plaintiff's deliberate decision not to challenge state constitutional provisions or the argument that such a decision created a redressability problem. And Plaintiffs don't point to any language from that opinion suggesting otherwise.

Finally, to the extent Plaintiffs request in the alternative yet another opportunity to amend their complaint to fix a defect identified prior to their latest amendment, that request should be denied. Plaintiffs were on notice that they lacked standing on these claims well before they amended their complaint, and Plaintiffs should not be allowed a *third* bite at the apple. This Court should dismiss the complaint.

## II.    Arkansas's regulations do not violate the First Amendment.

Plaintiffs attempt to save their First Amendment claims in two main ways. First, for some claims, they rely on out-of-circuit precedent that directly conflicts with controlling Eighth Circuit authority. Second, for others, Plaintiffs simply ignore authority all together, gloss over their failure make anything more than conclusory allegations, and simply assert that a more detailed factual record is necessary to adjudicate their claims. Neither approach is persuasive. Consistent with binding precedent, this Court should dismiss Plaintiffs' First Amendment claims.

### A.    Residency requirement

Plaintiffs challenge Ark. Code Ann. 7-9-103(a)(6)'s requirement that paid canvassers be Arkansas residents as it applies to what they describe as canvassers who agree to submit to Arkansas's jurisdiction for purposes of investigation, prosecution, and service of profess with respect to any petition they circulate.  They claim that the Supreme Court's decisions in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999), dictate that *every* residency requirements for petition canvassers is constitutionally infirm.  Plaintiffs' claim cannot be squared with Eighth Circuit precedent.

In fact, *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001), held exactly the opposite.  Applying *Meyer* and *Buckley* there, the Eighth Circuit had little trouble upholding North Dakota's much more demanding requirement that *all* canvassers—paid *and volunteer*—be North Dakota residents.  *Id.* at 618.  While Plaintiffs grudgingly acknowledge that holding, they nevertheless urge the Court to ignore it on the grounds that the "lack of a record" in *Jaeger* somehow distinguishes it from this case.  Resp. 7.  But that hardly distinguishes this case since just as there was "no evidence in the record" in *Jaegar* to show that North Dakota's residency requirement imposed any "additional cost" on petitioners, Plaintiffs similarly fail to allege "what the additional cost to [Plaintiffs] would be" from Arkansas's regulation.  241 F.3d at 617.  Instead, Plaintiffs' complaint merely contains conclusory allegations that the residency requirement is severely burdensome.  *E.g.*, ¶ 85.

Contrary to Plaintiffs' framing, *Jaeger* also did not simply hold there was no burden due to the lack of evidence of costs.  Rather, *Jaeger* concluded that North Dakota's residency requirement did not suffer from the same flaws as the voter registration requirement in *Buckley* because—in contrast to that requirement—any North Dakota resident could participate in canvassing and canvassing had still been successful.  241 F.3d at 617.  Moreover, because *Jaeger* was

4

deciding this issue on an appeal from summary judgment, *id.* at 615, it necessarily "view[ed] the facts in the light most favorable to the nonmoving party, giving it the benefit of all reasonable inferences." *Office of Prosecuting Attorney for St. Louis Cnty. v. Precythe*,--- F.4th ---, 2021 WL 4235846, at *2 (8th Cir. Sept. 17, 2021).  Thus, applying *Jaeger*'s analysis here, Arkansas residency provision readily survives because it is even less restrictive than North Dakota's requirement since it doesn't even apply to unpaid—that is, volunteer—canvassers.  Indeed, in stark contrast to the North Dakota statute, out-of-state volunteer canvassers remain free to engage in the petitioning process.  And just as in *Jaeger*, "[n]on-residents are still free to speak to voters regarding particular measures; they certainly may train residents on the issues involved and may instruct them on the best way to collect signatures; and they may even accompany circulators." *Jaeger*, 241 F.3d at 617.

Plaintiffs' other attempt to avoid *Jaeger* amounts to little more than an assertion that case doesn't apply because it didn't consider whether requiring canvassers to "submit to the jurisdiction of the state" is a more narrowly tailored way to protect the petitioning process from fraud than a residency requirement.  Resp. 8.  But tailoring is only required where a requirement imposes a severe burden under *Anderson/Burdick*, and as noted, Plaintiffs have failed to sufficiently allege a severe burden.  In any event, Plaintiffs' tailoring argument is also unpersuasive because requirements, like that in *Jaeger* and at issue here, "ensure that a provision has grass-roots support in [the state] and that the initiative process is not completely taken over by moneyed, out-of-state special interest groups." *Jaeger*, 241 F.3d at 617.  And Plaintiffs have no response to this.

In sum, *Jaeger* controls and requires Plaintiffs' challenge to the residency requirement be dismissed.

## B.     Criminal-record prohibition and background-check requirement

Prohibiting certain criminals—including felons, sex offenders, and those convicted of fraud or election crimes— from participating in the petitioning process is just common sense. Plaintiffs do not dispute Arkansas's interest in protecting the public and the integrity of the electoral process.  Nor could they.  *See McDaniel*, 457 S.W.3d at 647 (holding that Arkansas "clearly has an interest" in assuring that paid canvassers "are aware of the applicable laws and do not have a criminal history that calls into question their ability to interact with the public in a manner consistent with [state] law[]").

Instead, to avoid dismissal, Plaintiffs appear to suggest that ascertaining whether a canvasser has been convicted of a relevant crime could be expensive.  *See* Resp. 43.  But all "[e]lection laws will invariably impose some burden upon individual voters."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  Thus, a regulation doesn't impose a severe burden simply because it might cost money to comply with it.  *See, e.g., Libertarian Party of N.H. v. Gardner*, 843 F.3d 20 (1st Cir. 2016) (upholding petitioning requirement where cost of compliance would be $50,000); *Swanson v. Worley*, 490 F.3d 894, 898 (11th Cir. 2007) (upholding modicum-of-support requirement for petitioning third-party candidates, compliance with which was estimated to cost $100,000).  Rather, the question is whether the regulation effectively prevents collection. *See Green Party of Ark. v. Martin*, 649 F.3d 675, 684 (8th Cir. 2011) (considering whether "achieving ballot access is . . . an impossible task").  And Plaintiffs don't actually claim that compliance is so expensive that it would prevent collection.  *See* Am. Compl. ¶¶ 103-112.  Nor for that matter do they explain how that could possibly be true since it's undisputed that initiative sponsors have complied with Arkansas's background-check requirements for the past decade. *Cf. Jaeger*, 241 F.3d at 617 (noting that a "high success rate demonstrates that no severe burden has

been placed on those wishing to circulate petitions"). Hence, Plaintiffs claim fails as a matter of law and should be dismissed.

### C.    Compensation regulation

It is axiomatic that, "paid canvassers, who make their livelihood gathering signatures and who often . . . are paid by the signature, have an incentive to submit forged or otherwise invalid signatures." *McDaniel*, 457 S.W.3d at 650. That's why Arkansas law prohibits compensation arrangements whereby a canvasser's pay is "impacted by or related to the number of signatures obtained." Ark. Code Ann. 7-9-601(g)(2); *see also id.* -601(c). Instead, Arkansas law leaves sponsors free to pay canvassers based on other, less problematic metrics, such as based on experience, based on hours worked, or by flat fee arrangement.

Plaintiffs claim that *Meyer* and *Buckley* bar states from regulating canvasser compensation. But once again, *Jaeger* forecloses Plaintiffs' argument. Applying *Meyer* and *Buckley* in that case, *Jaeger* upheld North Dakota's compensation ban on the grounds that it was a "means to prevent fraud" and rejected the plaintiffs' bare allegation that such a requirement "would in any way burden their ability to collect signatures." 241 F.3d 618.

Applying that rule here, Plaintiffs' claims likewise fail as a matter of law. Like North Dakota, Arkansas has a long history of petitioning irregularities and fraud that justify prohibiting fraud-incentivizing payment arrangements. For example, in 2013, the Arkansas General Assembly found numerous and pervasive irregularities in ballot petitions—including the fact that *none* of the petitions submitted in 2012 had "an initial validity rate in excess of fifty-six percent" and that three submitted petitions had a validity rate "below thirty-one percent." 2013 Ark. Act 1413, Sec. 1. In fact, among the "three petitions with the lowest initial validity rate," the General Assembly found "widespread instances of apparent fraud, forgery, and false statements in the signature-gathering process." *Id.* Those problems, moreover, haven't gone away. *See Zook v.*

*Martin*, 558 S.W.3d 385, 390 (Ark. 2018) (upholding determination that 4,371 signatures were invalid "because the canvassers attached false affidavits to the relevant petition parts"); *Benca v. Martin*, 500 S.W.3d 742, 750 (Ark. 2016) (excluding signatures "because the canvasser verified the petition before the voter signed it").  Arkansas's experience thus "justif[ies] the ban on commission payments as a necessary means to prevent fraud and abuse."  *Jaeger*, 241 F.3d at 618.

Plaintiffs' compensation claim should be dismissed.

### D.    Canvasser disclosure requirement

For nearly a decade, Arkansas has required sponsors to disclose the names and addresses of paid canvassers.  *See* 2013 Ark. Act 1413, sec. 21 (amending Ark. Code Ann. 7-9-601(a)(2)(C)).  Those requirements reflect Arkansas's "interest in ensuring that sponsors are aware of the identity of people who are being paid to solicit signatures from citizens as well as how to locate them should problems arise."  *McDaniel*, 457 S.W.3d at 646.

The Supreme Court has recognized that "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."  *Doe*, 561 U.S. at 197.  Applying that rule, *Doe* upheld the public disclosure of a referendum petition that contained the names and addresses of those who had signed that petition on the grounds "that public disclosure of referendum petitions in general is substantially related to the important interest of preserving the integrity of the electoral process" because it helps root out fraud and mistake in the petitioning process.  *Id.* at 199.

Plaintiffs argue that States have a greater interest in the public disclosure of petition signors than canvassers, whom they describe as merely "offering the voter an opportunity to sign a petition."  Resp. at 26.  That ignores the special role that petition canvassers play in Arkansas's initiative and referendum framework.  As the Arkansas Supreme Court has explained, canvassers act as "election officers" in the collection process.  *See Sturdy*, 143 S.W.2d at 551 (describing

canvasser's role as "the sole election officer, in whose presence the citizen exercises his right to sign the petition"). Canvassers are responsible for ensuring that Arkansas's petition-gathering regulations are followed and that only signatures from Arkansas electors are collected. If anything, the interest in public disclosure is greater for canvassers than those signing a petition. *Doe* controls here, and Plaintiffs' claim must be dismissed.

## III.   The witness-fraud prohibition does not impermissibly chill speech.

Plaintiffs agree that their vagueness challenge to the witness-fraud provision should be dismissed. *See* Resp. 48. That leaves only their claim that the criminal penalties attached to paying for or submitting fraudulent signatures impermissibly chills protected speech. Resp. 44. Plaintiffs, however, offer no real defense of that claim.

At bottom, Plaintiffs' argument appears to be that imposing criminal liability for the actions of paid canvassers—but not volunteer canvassers—"clearly imposes a chill on sponsors to exercise their constitutional right . . . to hire paid canvassers." Resp. 44. Yet it's not at all clear what that means or why Plaintiffs think that prevents dismissal of their claims. Indeed, Plaintiffs don't even attempt to explain how *not* imposing criminal liability for the actions of unpaid canvassers chills anyone. Nor—more fundamentally—do Plaintiffs explain why they think submitting fraudulent signatures is protected speech that this Court should worry about chilling.

Further, no more persuasive is Plaintiffs' attempt to bolster their vagueness-chilling argument by suggesting that a sponsor might be chilled because it could be subject to criminal liability where it "pays the canvasser for poorly witnessed signatures which the sponsor thereafter crosses out and does not submit." Resp. 44-45. The challenged statute could not be clearer: criminal liability only attaches where a sponsor or its agent "[k]nowingly pays a canvasser for petitioner signatures" that he did not personally witness, or where the sponsor or its agent "[k]nowingly submits . . . a petition part where the verifying canvasser has not witnesses each

9

signature." Ark. Code Ann. 7-9-109(f). The court does not need a "factual record" to read what the statute says. There is nothing vague or chilling about this language, and Plaintiffs make no serious attempt to show that there is. Plaintiffs' claim should be dismissed.

## IV.  Arkansas's regulations do not violate equal protection.

### A.  Criminal-record prohibition and background-check requirement

Plaintiffs' equal-protection claims against the criminal-record prohibition and back-ground-check requirement fail as a matter of law for two primary reasons.

*First*, under traditional equal-protection principles, the challenged provisions would, at most, be subject to rational basis review, and they readily pass. Plaintiffs (whether canvassers or sponsors) are not among the "suspect or quasi-suspect classifications" that courts have thus far identified—namely, race, immigrant status, national origin, illegitimacy, and sex. *Gallagher v. City of Clayton*, 699 F.3d 1013, 1018 (8th Cir. 2012); *see also Jaeger*, 241 F.3d at 618 (holding "there has been no showing that" petitioner plaintiffs "are a protected class").

Applying the appropriate level of scrutiny, the criminal-record prohibition and back-ground-check are constitutional if they are "rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). Those laws easily meet that standard be-cause both undoubtedly—as explained above in response to Plaintiffs' *Anderson/Burdick* claim—further Arkansas's interest in protecting the integrity of the petitioning and electoral pro-cess. *See supra* at 6. In fact, Plaintiffs only apparent retort to that undisputed fact is an unsup-ported assertion that there's no reason to treat paid and volunteer canvassers differently. *See* Resp. 40. But that distinction rests on the well-recognized principle that, "paid canvassers, who make their livelihood gathering signatures and who often . . . are paid by the signature, have an incentive to submit forged or otherwise invalid signatures." *McDaniel*, 457 S.W.3d at 650; *ac-cord* Act of Apr. 22, 2013, sec. 1, 2013 Ark. Acts 6084, 6086 (uncodified) (finding "[s]ponsors

and paid canvassers may have an incentive to knowingly submit forged or otherwise invalid signatures").

*Second*, equally unpersuasive is Plaintiffs' attempt to reframe their equal-protection claims as involving a fundamental right in order to justify more exacting scrutiny.  As previously explained, claims like Plaintiffs' are at most subject to *Anderson*/*Burdick*'s sliding scale-approach.  *See* Br. in Supp. of Mot. to Dismiss, ECF No. 15 at 22; *see also Whitfield v. Thurston*, 468 F. Supp. 3d 1064, 1096 (E.D. Ark. 2020) ("The Court examines plaintiffs' equal protection challenges to Arkansas's ballot access scheme using the same *Anderson-Burdick* balancing framework as it applied to their First Amendment claims.").  Plaintiffs cannot sidestep that framework (and demand more exacting scrutiny) by simply recasting their claim as an equal-protection claim that involve a fundamental right, and Plaintiffs don't cite any authority for that approach.  And this Court should reject Plaintiffs' attempt to rewrite equal-protection doctrine.

In sum, there is no equal-protection problem with disqualifying certain convicted criminals from serving as paid canvassers.  Nor does the federal Constitution forbid states from requiring canvassers and sponsors to ensure compliance with state laws designed to protect the integrity of the petitioning process.  Plaintiffs' equal-protection challenge should be dismissed.

**B.    The fifteen-county requirement does not violate "one man, one vote."**

The People of Arkansas have long recognized the value of ensuring that the State's largest handful of counties do not completely control the process of placing items on the statewide ballot.  Arkansas's Constitution thus requires sponsors to gather one-half of the statewide percentage required to place an initiative or referendum on the ballot from at least fifteen or more counties.  Ark. Const. art. 5, sec. 1; Ark. Code Ann. 7-9-108.  Plaintiffs erroneously argue that provision violates the Equal Protection Clause's "one man, one vote" principle.  Resp. 27.

To justify their claim, Plaintiffs wrongly conflate the right to vote and equal protection principles developed in that context with the right to participate in a state-created initiative process.  Underscoring this point, Plaintiffs rely largely on a bevy of cases holding that geographic requirements for political parties and candidates are problematic.  *See* Resp. at 27-39 (discussing, *inter alia*, *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969), and its progeny).  But this case doesn't involve requirements for placing candidates or parties on the ballot and the equal protection principles developed in those contexts simply don't apply here.  Indeed, in stark contrast to the candidate and political party context, neither the Supreme Court nor the Eighth Circuit has ever held that signature-gathering requirements for state initiative and referenda are subject to the same equal protection analysis.  And that makes sense because "courts have consistently recognized" that the "right to participate in initiatives and referenda . . . is not provided by the United States Constitution."  *Bernbeck v. Gale*, 829 F.3d 643, 649 n.4 (8th Cir. 2016).  *See also Kendall*, 650 F.3d at 523; *Todd*, 279 F.3d at 1211.  Rather, those things are exclusively a product of state law, and "[w]hat may constitute the invasion of a deeply fundamental, constitutionally recognized right to vote cannot be assumed to apply interchangeably with the state-created, nonfundamental right to participate in initiatives and referenda."  *Bernbeck*, 829 F.3d at 649 n.4.

In fact, far from endorsing Plaintiffs' approach, the Eighth Circuit has strongly suggested that the equal-protection case law that Plaintiffs rely upon doesn't apply to efforts to place initiatives and referenda on the ballot.  *Bernbeck*, for instance, considered a challenge to Nebraska's requirement that petitions secure signatures from five percent of the registered voters in each of two-fifths of the state's counties.  *Id.* at 643.  As here, the plaintiff in that case claimed that requirement unlawfully diluted the vote of voters residing in certain counties.  *Id.* at 646.  And although the Eighth Circuit ultimately rejected that claim on jurisdictional grounds, it nevertheless

went out of its way to note "the tenuous nature of Bernbeck's equal protection claim" and ex-plain that such an equal protection claim isn't "tethered to any constitutional mandates found in Section 2 of the" Fourteenth Amendment."  *Id.* at 649 n. 4.  Thus, as the court continued, it was "virtually certain that Bernbeck fails to state an actionable equal protection claim," and even if he could, "the required rational basis analysis would have doomed any such claim."  *Id.*

Applying that same analysis here, the challenged provision is at most subject to rational-basis review.  It readily survives that standard because, as noted, it ensures that a handful of large counties don't control the initiative and referenda process and that proposals enjoy a wide range of support.  Plaintiffs' claims therefore fail as a matter of law and should be dismissed.

## V.   The background-check requirement does not impose an unconstitutional condition on working as a paid canvasser.

Plaintiffs' unconstitutional conditions claim refutes itself.  Plaintiffs bizarrely claim that a petitioning regulation becomes an unconstitutional condition "if the sponsor deems the require-ments of the challenged provisions too onerous."  Resp. 46.  That claim bears no resemblance to the Supreme Court's unconstitutional-conditions doctrine case law, and unsurprisingly, Plaintiffs don't cite any authority to support their argument.  Instead, as noted, a severely burdensome reg-ulation—if that's what Plaintiffs mean to claim—is subject to an *Anderson/Burdick* analysis. And as explained at-length above, that claim fails on the merits.  *See supra* at Sec. II.B.   Plain-tiffs' unconstitutional conditions claim should be dismissed.

## VI.   Plaintiffs' *ex post facto* claim is meritless.

Plaintiffs' *ex post facto* claim is as frivolous as their unconstitutional conditions claim. Updating statutory lists of disqualifying convictions does not violate the *ex post facto* clause.  *Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1867), is not to the contrary.  Under that case, the relevant question on this claim is whether the legislature has used its authority over the qualifications for

an office simply "as a means for the infliction of punishment." *Id.* at 379.  But later cases—that Plaintiffs make no effort to distinguish—such as *Hawker v. New York*, 170 U.S. 189 (1898), and *Reetz v. Michigan*, 188 U.S. 505 (1903), hold that processional-licensing regulations, like the challenged provision here, do not "defin[e] a crime or increase[e] punishment for a crime." *United States v. Carter*, 490 F.3d 641, 643 (8th Cir. 2007) (internal citations and quotations omitted).  Hence, Plaintiffs' claim fails as a matter of law and should be dismissed.

## VII.   Arkansas's regulations do not violate the state constitution.

Plaintiffs' claim that the residency requirement, witness-fraud provisions, background-check requirement, and compensation regulation violate the Arkansas Constitution are meritless.

Plaintiffs' response to the motion to dismiss these claims consist of little more than indig-nation.  *See* Resp. 47 (describing an "effort to pussy foot around the constitutional text"); *id.* (de-claring Plaintiffs' interpretation of the constitution "self-evident from any intelligent individual save for the politicians perched in the state capitol building"); *id.* (contending a factual record is necessary to demonstrate "how idiotic the attempted distinction is in the failed effort by the leg-islature").  Indeed, Plaintiffs' response tellingly lacks any legal argument or citation to case law supporting their claims that the challenged provisions violate the state constitution.  Yet that's hardly surprising given that the Arkansas Supreme Court has previously upheld many of the re-quirements that Plaintiffs challenge.  *See McDaniel*, 457 S.W.3d at 647; Br. in Supp. of Mot. to Dismiss, ECF No. 15 at 27-30.  The Court should dismiss Plaintiffs' state-law claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  October 18, 2021

Respectfully submitted,

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI  (2016097)
  Solicitor General
DYLAN L. JACOBS (2016167)
  Assistant Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
(501) 682-2591 (fax)
Dylan.Jacobs@arkansasag.gov

*Counsel for Defendant*